FILED
2012 Sep-18  PM 03:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BONNIE L. JOHNSON**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:11-CV-1666**-KOB |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January 30, 2008, the claimant, Bonnie L. Johnson, filed an application for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act.  The claimant alleges her disability began on March 24, 2006.  The Commissioner denied the claim on March 20, 2008, and the claimant filed a timely written request for a hearing before an Administrative Law Judge.  The ALJ held a hearing on February 25, 2010.  On April 1, 2010, the ALJ denied the claim,  finding that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for supplemental security income.  The Appeals Council denied the request for review on March 23, 2011.   The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ improperly applied the Eleventh Circuit's three-part pain standard by failing to consider the claimant's

alleged limited function in her right hand; (2) whether the ALJ properly considered the claimant's alleged need of a hand-held assistive device under Social Security Ruling 96-9p; (3) whether the ALJ erred in determining the claimant's residual functioning capacity by failing to consider the claimant's alleged need of a hand-held assistive device and her limited function in her right hand; and (4) whether the ALJ erred by failing to fully develop the record by not contacting the claimant's treating physician to determine if the use of a hand-held assistive device is medically required.

### III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is a limited one.  If the Commissioner's decision is supported by substantial evidence, this court must find the Commissioner's decision conclusive.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).   "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).   A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).   The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the
> community?
>
> An affirmative answer to any of the above questions leads either to the
> next question, or, on steps three and five, to a finding of disability.  A
> negative answer to any question, other than step three, leads to a
> determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (1th Cir. 1986); 20 C.F.R § §  404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider

whether the claimant demonstrated an underlying medical condition, *and either* "(1) objective

medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2)

that the objectively determined medical condition is of such a severity that it can reasonably be

expected to give rise to the alleged pain."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)

(emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R.

§ 404.1529. If the claimant presents subjective complaints of pain, and the ALJ decides to

discredit that testimony, the ALJ must discredit it explicitly and articulate her reasons for doing

so.  *Brown v. Sullivan,* 921 F.2d 1233, 1236 (11th Cir. 1991).

In evaluating a claimant's credibility, an ALJ  can consider the claimant's appearance and

actions during the administrative hearing.  *See* 20 C.F.R. §§ 404.1549(c)(3)(vii), (c)(4);

416.929(c)(3)(vii), (c)(4); *see also Macia v. Bowen*, 829 F.2d 1009, 1011 (11th Cir. 1987).  In

addition to the claimant's appearance, the ALJ can consider the claimant's failure to comply with

a physician's orders in assessing the claimant's credibility.  *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).

To show that a claimant's use of a hand-held assistive device is medically required and to prove the severity of the alleged dependence, the claimant must present medical documentation "establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed."  SSR 96-9p, 1996 WL 374185, at *7 (1996).  When using this legal standard to determine the claimant's need for a hand-held assistive device, "the adjudicator must always consider the particular facts of a case."  *Id.*

If the ALJ finds that a claimant's impairments do not meet the severity of a listed impairment, the ALJ then determines the claimant's residual functioning capacity – her ability to do work despite her impairments.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  Once the ALJ determines a claimant's residual functioning capacity, the ALJ must show, often through the testimony of a vocational expert, that jobs are available that the claimant can perform.  *Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996).  The ALJ may consider vocational expert testimony in her ultimate decision; however, the ALJ is not required to include findings in a hypothetical posed to the expert that the ALJ has found to be unsupported by the evidence.  *Crawford v. Comm. of Social Security*, 363 F.3d 1155, 1161 (11th Cir. 2004).

Additionally, an ALJ has an obligation to develop a full and fair record; however, the obligation only requires an ALJ to contact the treating physician of the claimant when the evidence provided is inadequate to determine whether the claimant is disabled.  *See* 20 C.F.R. §§ 404.1512(e), 416.912(e); *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  The ultimate burden of proving disability and producing supporting evidence rests with the claimant. *Ellison*, 355 F.3d at 1276.

## V. FACTS

The claimant has completed the ninth grade and was forty-four years old at the time of the ALJ's decision.   Her previous work experience includes employment as a lift driver, packager, and grinder.   The claimant alleged disability beginning on March 24, 2006, due to injuries from a horse-riding accident.  The claimant originally alleged injuries including degenerative disc disease; osteoarthritis; pain in her neck, back, elbows, cervical spine, and legs; and a depressive disorder.  (R. 108-111, 114).   As a result of these injuries, the claimant alleges that she cannot sit or stand for any length of time; is in constant pain in the hip and pelvic areas; and has headaches. (R. 207). On appeal, the claimant did not specifically contest the ALJ's findings regarding the impact of her depression on her ability to work.

*Physical Limitations*

On June 18, 2001, the claimant presented to the emergency room at Cullman Regional Medical Center with back pain after she fell off a horse the previous day.  (R. 108-111).   She complained of back, neck, elbow, and foot problems, and noted a history of degenerative disc disease.  (R. 11).  Dr. Fred Moss, a radiologist at Cullman Regional Medical Center, determined that the claimant's lumbar region had changes in the anterosuperior border of L4 and had the appearance of a limbus vertebra.   However, the records indicated that no fractures or subluxations exist within her spinal discs.  The claimant received prescriptions for pain medication and orders to return to the hospital if her pain became worse.  (R. 112-114).

After the incident, the claimant followed up with treatment from Dr. Jamie Sharpton, a general family physician at Cullman Primary Care,  for back pain and leg pain.  (R. 131-36).  On July 25, 2001, the claimant reported slow improvement to Dr. Sharpton but maintained she was unable to work.  (R. 134).   Dr. Sharpton referred the claimant to Dr. Gregory Mick of

Neurosurgery & Spine Associates of Alabama.  On June 26, 2001, the claimant reported to Dr. Mick that her pain was an eight on a scale of one-to-ten.  She continued to see Dr. Mick until around March 12, 2002.  (R. 117-119, 121).

On March 2, 2002, Dr. Michael Jokich of Woodland Medical Center conducted a MRI on the referral of Dr. Mick.  The MRI revealed that the claimant  had degenerative disc disease at L5-S1 of the lumbar region with mild to moderate disc bulging at the L5-S1 level of the spine. (R. 124).

Then, Dr. Kelvin Johnson, also of Woodland Medical Center, performed a discogram procedure on March 7, 2002, on the referral of Dr. Mick.  The procedure showed a normal appearance in the L4-5 and L3-4 areas of the spine.   (R. 127-28).

Dr. Mick reviewed the results of the lumbar MRI and the discogram and determined that the claimant had degenerative disc disease in the L4-5 and L5-S1 region and prescribed her a lumbar corset brace and various pain medications, including Lortab.  (R. 117-122).

The claimant subsequently sought treatment from Dr. Jay Pohl of Hartselle Family Medicine for her continued back and leg pain on August 13, 2002.  On August 13, 2002, Dr. Jay Pohl prescribed the claimant pain medication to treat her neck and back pain, despite the claimant having a good range of motion in her cervical spine.  On January 3, 2003, the claimant again sought pain treatment from Dr. Pohl after she "ha[d] been off Lortab for a couple of weeks."  She complained of tenderness near her lower lumbar area and pain with hip flexion. Dr. Pohl prescribed the claimant Lortab and advised her to try a pain clinic or vocational rehabilitation.  In early 2004, Dr. Pohl treated the claimant for her lower back and neck pain again.   Dr. Pohl again prescribed the claimant with Lortab, but he refused to increase the dosage despite the claimant's request to do so.  (R. 140-142).

6

On May 4, 2004, by request of the Disability Determination Service, Dr. Will Crouch of the American Board of Family Practice conducted a consultative evaluation regarding the claimant's back, hip, and leg pain. The claimant complained of severe pain and the inability to do certain activities, like housework.   Dr. Crouch noted that the claimant was able to move around without an assistive device.  Dr. Crouch determined that the claimant had chronic low back pain with only minimal degenerative changes in the spine.  (R. 197-98).

During a period from December 13, 2004 through July 28, 2005, the claimant underwent a series of lumbar epidural steroid injections at the Center for Pain Management at the Huntsville Hospital on Dr. Pohl's referral.  Specifically on May 10, May 17, and May 31, 2005, the claimant reported that the injections resulted in "good" pain relief.  (R. 212-220).

Dr. Timothy Frye of the Alabama Orthopedic Institute conducted an MRI on October 29, 2005, that revealed normal spine alignment and no significant degenerative disc disease.   Dr. Frye concluded that only mild degenerative change existed in the spine and that the claimant had some mild to moderate osteoarthritis; however, the levels were overall "unremarkable."   (R. 491).

On November 3, 2005, Dr. Eston Norwood III examined the claimant for a consultative neurology evaluation at the request of the Disability Determination Service.  Dr. Norwood concluded that the claimant had back pain, but that a neurological deficit was not the cause of the pain.  Dr. Norwood also found no impairment in her ability to stand, walk, lift, carry, or perform work related activities.   (R. 248-49).

Subsequently, Dr. Swader at Cullman Primary Care treated the claimant for her pain from January 2006 to August 2007.   (R. 509-20, 559-68).  Beginning in January 2006, Rebecca Williams, a nurse in Dr. Swader's office, noted in the claimant's treatment notes that the

claimant used a cane.  (R. 510-18).  On October 17, 2006, Dr. Swader ordered an x-ray of the claimant's spine that revealed normal alignment with minimal degenerative changes in the lumbar and thoracic spine and negative findings in the claimant's cervical spine.  (R. 498-501).  On November 27, 2006, the claimant reported doing well until around November 16, 2006.  (R. 509).

Dr. Swader's records show that the claimant failed to comply with suggested treatment in the form of physical therapy.  (R. 493).  During November 2006, Dr. Swader's records indicate that the claimant had trouble complying with portions of her signed narcotics agreement, specifically the prohibition against receiving multiple prescriptions for pain medication from other doctors.  Dr. Swader terminated the claimant's treatment in August 2007, after a blood and urine test revealed the claimant had various medications in her system that were not prescribed by Dr. Swader.   (R. 509, 559).

Later in 2008, the claimant sought treatment for her pain from Dr. Chris LaGanke of North Central Neurology Associates.  Originally, the claimant reported improvement in her pain.  (R. 584-86).  In October 2009, the claimant again reported pain to Dr. LaGanke; however, Dr. LaGanke's office conducted a bone scan on October 7, 2009, that revealed only mild osteoarthritis.  (R. 663, 675).

During her treatment with Dr. LaGanke, the claimant also reported feeling nervous and requested that Dr. LaGanke prescribe her Klonopin, which she had tried before and believed helped with her anxiety.  (R. 676).  Dr. LaGanke prescribed the claimant Klonopin, which she continued to take at the time of the administrative hearing.  (R. 663-676, 694).  Despite complaints of anxiety and depression, the claimant did not seek any mental health treatment other than seeking medication from her neurologist, Dr. LaGanke.  (R. 694-95).

On February 19, 2008, the claimant completed a Physical Activities Questionnaire for the Disability Determination Service and noted that she had difficulty performing all activities. (R. 404-12). A month later on March 10, 2008, the claimant completed a Daily Activities Questionnaire for the Disability Determination Service. In contrast to the prior questionnaire, the claimant reported that she could care for her personal needs on her own; shop for personal needs; prepare and cook meals; do the laundry; and clean the house. (R. 432-36).

On January 20, 2009, the claimant sought treatment from Cullman Regional Medical Center Emergency Room after she injured her hand in a physical altercation with her daughter. (R. 619, 655). Dr. Scott Akin read the radiology report and noted that the claimant had a transverse fracture in the distal shaft and head of the fifth metacarpal on her right hand. (R. 619). In February 2009, the claimant sought treatment for her resulting hand pain from Dr. Steven Fuller at Alabama Orthopedic Institute. On January 21, 2009 and February 4, 2009, Dr. Fuller confirmed a fracture in the right hand, but found normal intrinsic muscle function and no joint deformities. Dr. Fuller ordered the claimant to continue wearing a splint and follow up a few weeks later. (R. 653-56).

### The ALJ Hearing

After the Commissioner denied the claimant's application for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 302). At the hearing on February 25, 2010, the claimant testified that before she takes her medicine, she cannot withstand her pain. After she takes her medicine, her pain, on a scale from one-to-ten, ranges from a "seven to eight all the time." (R. 696). The claimant also testified that she experiences headaches "all day." (R. 703). The claimant attributed her pain and ailments to the accident she experienced when she was thrown from a horse in 2001. (R. 686). She also attributed her right-

9

hand pain and limited functioning to a physical altercation that occurred in 2009.  (R. 684, 704-05).

The claimant testified that she was not currently working and that her only source of income was child support in the amount of $300 a month that she received to support her teenage son who lives with her on the weekends.  (R. 686).  The claimant stated that she has not worked since her employment with Electrolux Home Products/Americo ended in 2002.  The claimant stated that after the plant shut down, she received severance pay into 2003. (R. 687).   The claimant testified that during her employment, the claimant drove a forklift, packaged pallets for shipping, and packaged refrigerator pumps on the assembly line.  (R. 689).   The claimant noted that with these positions, she did "a lot" of bending, reaching, and stooping.  (R. 688).

Because of her pain, the claimant testified that she spends "a lot" of the day reclined.  She testified that she gets out of bed, takes her medicine, reads her Bible for a couple of hours while sitting up, gets coffee, stretches around, and fixes her father a grilled cheese, but "that's it."  (R. 706).

The claimant also testified about her many different doctors and medications.  The claimant confirmed that she could no longer seek Dr. Swader's services after she gave a blood and urine test revealing pain medications in her system that were not prescribed by Dr. Swader. (R. 690-92).   The claimant also confirmed that she failed to do the physical therapy exercises that Dr. Swader recommended and failed to cease smoking as requested.  (R. 692-93).

The claimant testified that she is currently taking Methadone for her pain; Soma for her pain and to relax her muscles; and Klonopin for her nerves and depression.  (R. 694).  Although the claimant testified about her depression, she confirmed that she has not been treated for depression by a mental health professional.  (R. 694-95).   The claimant confirmed that she often

10

takes all eight of her Methadone pills at one time during the day.  The claimant stated that the doctors told her that if she took all the pills at once, her instant relief would eventually wear off.  The claimant also admitted that the proper way to take the prescribed medication was to take the pills throughout the day.  (R. 698).

The claimant went into more detail about her daily routine, testifying that she goes "from recliner to couch to bed."  (R. 699).  However, the claimant also testified that she does her own housework and drives herself places, like to the grocery store.  (R. 699, 701).  She testified that she also takes care of her father who lives behind her.  (R . 702).  She stated that she makes him lunch, stays at her father's house for the afternoon, and often stays for dinner.  (R. 707-08).

The claimant's attorney questioned the claimant about her use of a cane.  The claimant testified that she has used a cane since the horse fall in 2001 and that the cane relieves pressure on her feet and legs.  (R. 704).  She also discussed how she injured her hand in a physical altercation with her daughter in 2009 for which she sought emergency room treatment.  (R. 684, 704-05).  She testified that she was unable to pick up anything heavy with that hand.  (R. 705).

Melissa Neel, a vocational expert, offered testimony on the claimant's ability to return to previous work and the type and availability of jobs the claimant could feasibly perform.  The ALJ posed a hypothetical to Ms. Neel involving an individual who is limited to a light duty range of work with the following limitations: occasional walking and standing for two hours out of an eight-hour day; occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing; and the option to sit or stand for a couple of minutes every hour.  According to Ms. Neel, these limitations would preclude such an individual from engaging in any of the claimant's prior work.  (R. 710).

Ms. Neel further testified that the hypothetical individual could perform the functions of a

number of sedentary, unskilled jobs, where the individual could be seated most of the time with the option to stand.   Such jobs would include an order clerk,  inspector, and assembler. According to Ms. Neel, these jobs were available in significant numbers in both the regional and national economies.  (R. 711).

The ALJ then narrowed the hypothetical, limiting the individual to sedentary and occasional gross handling with the upper right extremity.  Ms. Neel indicated that such an individual could not perform the claimant's past relevant work with such an impairment.  In response to the question of whether this individual would be able to find jobs in the national and local economy, Ms. Neel determined that if the individual was right-hand dominant, a very limited number of jobs at the unskilled level would be available.  (R. 711-12).

The claimant's attorney, Don Bevil,  then narrowed the hypothetical, asking whether having a pain range of seven to eight on a continuous everyday basis would present a problem with the available jobs that were mentioned.  Ms. Neel responded that she believed that having a pain range of seven to eight on a continuous basis would be a problem with those jobs.  Mr. Bevil then modified the hypothetical, requiring opportunities for the individual to lie down during the work day.  Ms. Neel responded that the available jobs she previously mentioned would not allow for opportunities to lie down during work hours.  Mr. Bevil again modified the hypothetical, adding the question of how much absenteeism would be available in the previously mentioned jobs.   Ms. Neel determined that with unskilled work, an individual would not be able to miss more than one day per month, and with skilled or semi-skilled work, an individual would be able to miss up to two days per month.  (R. 712-13).

*The Administrative Decision*

On April 1, 2012, the ALJ issued a decision finding the claimant not disabled under

Sections 216(I), 223(d) and 1614(a)(3)(A) of the Social Security Act.  (R. 302).  The ALJ's findings of fact and conclusions of law followed the five-step legal standard outlined in 20 C.F.R. §§ 4040.1520, 416.920.

First, the ALJ found that the claimant had not engaged in any substantial gainful activity since the alleged onset of her disability.  Next, the ALJ found that the claimant's degenerative disc disease, cervical spine nerve pain, osteoarthritis with related pain, and depressive disorder qualify as severe impairments.   However, the ALJ found that these impairments do not singly or in combination manifest the specific signs and diagnostic findings of the Listing of Impairments. (R. 304-305).

Advancing to step four, the ALJ considered the claimant's subjective allegations of pain to determine whether the claimant had the residual functioning capacity to perform light work. (R. 305).  The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 306).

In support of this conclusion, the ALJ highlighted the inconsistent testimony of the claimant.  The ALJ explained that during the hearing, the claimant stated that she drove to the hearing and drives her father to the store, but she recorded in her Disability Report that she "stay[s] at home all the time [and] don't drive."  (R. 307-08).

The ALJ further explained  the claimant's inconsistencies by noting that the claimant testified that she takes care of her father every day; stays with him during the afternoon to watch television; and then prepares and eats dinner at his home.   The ALJ pointed out that the claimant

also testified, however, that from eight o'clock in the morning to eight o'clock in the evening, she spends most of the day reclining.   Additionally, the ALJ noted that despite the claimant's allegations of constant pain, the claimant showed no visible signs of being in pain and did not move around or change positions at any time during the one-hour administrative hearing.

The ALJ articulated additional inconsistencies regarding the claimant's alleged inability to work.  The ALJ discussed how the claimant responded on her Daily Activities Questionnaire in March 2008.  Specifically, the ALJ noted that the claimant reported she could "take care of her personal needs without assistance, prepare and cook meals, shop for her personal needs, do the laundry, and clean." (R. 306).  In highlighting the claimant's inconsistencies, the ALJ compared this report with another report the claimant filled out one month earlier in February 2008 that indicated the claimant had significant limitations in performing all activities.  (R. 307).

The ALJ also relied on the claimant's inconsistent medical history to reach the conclusion that the claimant lacked credibility.  The ALJ pointed out that while the claimant has alleged lower back pain since she fell off the horse in 2001, her lumbar spine x-rays revealed only mild disc spacing at L5-S1.  The ALJ also noted that a MRI performed by Dr. Michael Jokich in 2002 showed "mild to moderate disc bulging" and that a MRI conducted by Dr. Timothy Frye in 2005 revealed "only mild degenerative changes at L5-LS and mild to moderate osteoarthritis."   The ALJ additionally relied on x-rays ordered by Dr. Swader in 2006 that revealed only minimal degenerative changes in the lumbar and thoracic spine and negative findings in the cervical spine.  Last, the ALJ noted that the bone scan conducted by Dr. LaGanke's office  in October 2009 revealed only mild osteoarthritis.  (R. 307).  Consequently, the ALJ concluded that while the claimant continued to report pain, the medical evidence did not support the severity alleged by the claimant.

14

Additionally, the ALJ found that although the claimant alleges depression, she has not sought any mental health treatment nor presented evidence of significant limitations as a result of the alleged depression. (R. 307-08).  Next, the ALJ discussed how the claimant has continued to report that her pain medications and treatments, including heavy doses of Lortab and several epidural injunctions, are not relieving her pain.   The ALJ also considered the claimant's testimony confirming her failure to follow medication dosage requirements, her failure to follow physical therapy orders, and her failure to cease smoking as further evidence of the claimant's lack of credibility.  (R. 308).

The ALJ also addressed the claimant's more recent injury to her hand, which resulted from a physical altercation.  Although the claimant has continued to complain of hand pain and swollen fingers since the injury, the ALJ found no objective medical evidence of any resulting limitations that would prevent the claimant from performing all work activity. (R. 307).

Ultimately, the ALJ determined that, although back pain has limited the claimant's functioning, the claimant has not proven the level of severity that would prevent all work activity. Pointing out her daily activities, the ALJ found that the claimant can perform activities with a light level of exertion with certain limitations.  (R. 308).   Such limitations would include walking and standing for up to two hours during an eight-hour workday and occasional postural maneuvers such as balancing, stopping, kneeling, crouching, crawling, and climbing.  (R. 305).

In addressing the next step, the ALJ found that the claimant would be unable to perform past relevant work, but held that considering the claimant's age, education, work experience, and residual functional capacity, jobs exist in the national and local economy that the claimant could perform.  (R. 309).   The ALJ relied on the vocational expert's testimony in finding that the claimant could work as an order clerk, inspector, and assembler.  Because of the claimant's

residual functioning capacity and the availability of appropriate jobs, the ALJ found that the claimant would be capable of making a successful adjustment to other work and, therefore, found the claimant was not disabled.  (R. 310).

## VI. DISCUSSION

### 1.   The ALJ properly applied the Eleventh Circuit's three-part pain standard.

First, the claimant contends that the ALJ improperly applied the Eleventh Circuit's three-part pain standard by failing to consider the claimant's limited function in her right hand.  To the contrary, this court finds that the ALJ properly applied the pain standard and that substantial evidence supports her decision.

When a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms, the pain standard applies.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."  *Id.*   If a claimant presents subjective testimony that is supported by medical evidence that satisfies the pain standard, a finding of disability is appropriate.  *Foote v. Charter,* 67 F.3d 1553, 1561 (11th Cir. 1995).

In applying the three-part pain standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan,* 921 F.2d 1233, 1236 (11th Cir. 1991).  Failure to articulate the reasons for discrediting the claimant's subjective complaints of pain requires that the testimony be accepted as true. *Id.*

In this case, the ALJ conceded that the claimant suffers from an underlying medical

16

condition capable of generating pain; however, the ALJ found that the entirety of the medical evidence failed to support the claimant's alleged severity of pain. Specifically, the claimant's alleged limitations with her right hand are inconsistent with and unsupported by the objective medical evidence in the record.

The ALJ explicitly articulated her reasons for discrediting the claimant's alleged severity of pain generally. First, the ALJ explained that the claimant's daily activities were inconsistent with her alleged disabling symptoms. The ALJ noted that in February 2008, the claimant reported to the Disability Determination Service that she had difficultly performing all activities, including caring for her personal needs and driving. However, the ALJ explained that only a month later in March 2008, the claimant reported to the Disability Determination Service that she was able to do a range of activities including the following: caring for her personal needs without assistance; shopping for her personal needs; preparing and cooking meals; doing laundry; cleaning the house; and visiting her family and friends after church. Additionally the ALJ pointed out that in the March 2008 report to the Disability Determination Service, the claimant also confirmed that she was able to leave the house about four times a week. By comparing the claimant's own admission of her ability to perform activities and her statement to the contrary, the ALJ showed the inconsistency and resulting doubt as to the claimant's credibility.

At the hearing in 2010, the claimant testified that she is unable to work due to her impairments and has to recline from eight o'clock in the morning until eight o'clock at night. However, the ALJ noted that the claimant's testimony was inconsistent with other statements she made at the hearing concerning her daily activities. The ALJ pointed to the contrary testimony in which the claimant admits that she cleans her home; drives; goes to her father's house and cares for him; cares for her thirteen-year-old son; and cooks and prepares meals. In finding

17

inconsistency and a lack of credibility, the ALJ also relied on the fact that the claimant testified that she drove to the administrative hearing, despite her earlier statements that she does not drive.

As an ALJ is allowed to consider the claimant's appearance during the hearing in assessing credibility, the ALJ also appropriately relied on the fact that during the one-hour administrative hearing, the claimant showed no visible signs of being in pain and did not move around or change positions at any time during the hearing.  See 20 C.F.R. §§ 404.1549(c)(3)(vii), (4), 416.929(c)(3)(vii), (4); *Macia v. Bowen*, 829 F.2d 1009, 1011 (11th Cir. 1987).

In addition to reviewing the claimant's conflicting testimony and statements, the ALJ also considered the severity of the claimant's alleged pain by reviewing the claimant's objective medical records.  Although the record shows that the claimant experienced low back pain beginning when she fell from a horse in 2001, the ALJ articulated that the alleged severity of the claimant's resulting pain and symptoms are not supported by the findings within the medical records.  The ALJ considered x-rays of the claimant's lumbar spine, taken by Dr. Swader in 2006, which revealed only mild disc space changes. The ALJ also relied on x-rays of the claimant's pelvis and cervical spine, taken by Dr. Swader in 2006, that only revealed negative findings.  Additionally, the ALJ pointed to a MRI in 2002, conducted by Dr. Jokich, that showed degenerative disc disease with mild to moderate disc bulging and to a later MRI in 2005, conducted by Dr. Frye, that showed normal spine alignment and no significant degenerative disc disease.  The ALJ also explained that a bone scan that Dr. LaGanke performed in 2006 revealed only mild osteoarthritis.  (R. 307).  The ALJ concluded that the overwhelming objective medical evidence showed that the claimant's alleged severity of pain and resulting limitations are not supported by the medical records, which generally indicate the claimant had only slight spinal changes and relative normal spine alignment.

18

Next, in her determination as to claimant's credibility, the ALJ considered the claimant's failure to comply with her various doctors' recommendations, which may be used as a factor for discounting allegations of disability.  *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).   The ALJ pointed to numerous instances of noncompliance.  First, although Dr. Swader referred the claimant to physical therapy, the ALJ noted that the claimant never attended the prescribed physical therapy.  Next, the ALJ pointed out that Dr. Swader terminated the claimant's pain management treatment after previous warnings because the claimant failed to follow the narcotics agreement by obtaining pain medications from multiple providers. Additionally, the claimant failed to cease smoking cigarettes as requested by her doctors.  Last, the ALJ explained that the claimant admittedly failed to comply with her medication dosage, and despite being told otherwise, she takes all of her pain medication at once, at the beginning of the day.

In addition to discrediting the claimant's subjective complaints of general pain, the ALJ also properly discredited the claimant's subjective complaints of the severity of the limitations with her right-hand.  The claimant contends that the ALJ improperly disregarded the fact that she is limited to occasional gross handling with her right hand. Although the ALJ conceded that the claimant's hand was injured at one time, the ALJ determined that the claimant's alleged severity and resulting limitations are solely based on her subjective assessment.

The ALJ properly relied on the claimant's medical records concerning her hand treatment with Dr. Fuller that indicated that she had normal hand intrinsic muscle function, normal muscle tone, and no finger or joint deformities.  The objective medical evidence failed to reveal any medical orders or conclusions that the claimant could not perform any functions with her right hand.

19

Additionally, the claimant's own testimony shows the wide range of daily activities she is able to do despite the alleged limitations in her right hand.   Based on the same reasons relied on in the credibility finding concerning the claimant's overall pain—the medical records, the inconsistent claimant testimony, and the claimant's failure to comply with medical orders—the ALJ properly found that the claimant's subjective complaints as to her hand limitations were not entirely credible nor supported by objective medical evidence.

Based on the explicit findings of the ALJ, this court concludes that the ALJ properly applied the Eleventh Circuit's three-part pain standard and that substantial evidence supports the ALJ's decision in finding that the claimant's subjective allegations of pain, including the limitations with her right hand, are not supported by objective medical evidence and are undermined by the claimant's lack of credibility.

### 2.  The ALJ properly considered the claimant's need for a cane under Social Security Ruling 96-9p.

The claimant contends that the ALJ improperly rejected her testimony about reliance on her cane to ambulate.   Specifically, the claimant contends that under Social Security Ruling 96-9p, she has proven that her need for a cane is medically required, and thus, the ALJ should have considered her reliance in the determination of disability and her ability to work.  The claimant also contends that a medical prescription for a cane is not necessary to prove that a cane is medically required under Social Security Ruling 96-9p and that her subjective reliance on a cane is enough to affect the disability determination.

However, this court finds that the ALJ properly considered the claimant's subjective testimony regarding her reliance on a cane and discredited that reliance based on the lack of objective medical evidence.

Under Social Security Ruling 96-9p, a hand-held assistive device is medically required

where medical documentation "establish[es] the need for a hand-held assistive device to aid in walking or standing, and describ[es] the circumstances for which it is needed."   Additionally, "the adjudicator must always consider the particular facts of a case" when determining the need for the device.  SSR 96-9p, 1996 WL 374185, at *7 (1996).

In the ALJ's decision, the ALJ noted that the claimant testified that she used a cane to walk, but that her physician did not prescribe the cane, implying that no medical documentation exists to show the claimant's need for a cane, as required by Social Security Ruling 96-9p. Assuming that the claimant's assertion is correct, and a prescription for a cane is not required to establish need, the legal standard still requires that the claimant show some "medical documentation *establishing the need* for a hand-held assistive device."  SSR 96-9p, 1996 WL 374185, at *7 (1996) (emphasis added).

The claimant points to treatment notes made by a nurse that simply state that the claimant was using a cane during her visits with one physician, Dr. Swader; however, those notes do not establish that the *physician* believed or determined that the claimant required the use of a cane. The specific treatment notes in question, along with the entire record, lack any objective medical documentation or evidence showing that a physician found, in his or her professional opinion, that the claimant needed a cane or should use a cane to assist with her alleged symptoms.

This court finds, in fact, that medical records show that the claimant was able to ambulate without a cane.  Dr. Crouch performed a consultative examination on the claimant in 2004 and specifically noted that she was able to move around the room without an assistive device.  (R. 197-).  Dr. Mick, who treated the claimant in 2001 and 2002, did not state in his treatment notes that she ever used a cane during her visits with him.  (R.117-120).  Additionally, during the claimant's treatment for back pain with Dr. Pohl from 2002 to 2004, Dr. Pohl's treatment records

do not state that the claimant was ever using a cane or was unable to ambulate without a cane. (R. 140-142).   Dr. Norwood examined the patient in 2005 and did not report that the claimant was using a cane or that she needed a cane to ambulate.  (R. 248-49).

Not only has the claimant failed to present any medical documentation showing the need for the device, she has also failed to show the circumstances for which the assistive device is needed.  Because the claimant failed to present medical documentation showing the need for a hand-held assistive device or medical documentation showing the circumstances for which a hand-held device is medically required, the ALJ correctly rejected the claimant's alleged reliance on the cane and the limitations that reliance creates in determining disability status.  See SSR 96-9p, 1996 WL 374185, at *7 (1996).

### 3.  The ALJ properly determined the claimant's RFC to perform light work with limitations.

The claimant also contends that the ALJ erred in reaching her determination that the claimant has the RFC to perform light work with an option to sit or stand and with the limitation of walking and standing for only two hours during an eight-hour workday.  The claimant contends that the ALJ did not properly consider her need for a cane, as well as her limited gross handling in her right hand, in her determination that the claimant could do light work.  The court finds that the ALJ properly considered all of the claimant's limitations and correctly determined the RFC.

When a claimant's impairments do not meet the severity of a listed impairment, the ALJ makes a determination as to the claimant's residual functioning capacity, which is the claimant's remaining ability to do work despite his or her impairments.  *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997); *see* 20 C.F.R. § 404.1520(f).   After determining the claimant's RFC, the ALJ must show that other jobs exist in the national economy that the claimant can perform.

*Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996).   The ALJ may use a vocational expert's testimony to determine the existence of jobs in the national economy that meet the claimant's ability. *Id.* at 1077-78.   While the ALJ may use the expert's testimony in her determination, the ALJ is not required to include findings in a hypothetical posed to the expert that the ALJ has found to be unsupported by the evidence.   *Crawford v. Comm. of Social Security*, 363 F.3d. 1155, 1161 (11th Cir. 2004).

The ALJ posed numerous hypothetical situations to the vocational expert to determine the claimant's RFC and possible jobs the claimant could perform in the national economy.  Taking into account the claimant's alleged limitations, the ALJ posed a hypothetical with an individual who is limited to the following:  a light range of work with occasional walking and standing for two hours out of an eight-hour day; occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing; and an option to sit and stand during the work day for a couple of minutes every hour.  The vocational expert testified that the hypothetical individual could perform the functions of a number of sedentary, unskilled jobs, where the individual could be sitting most of the time with the option to stand.  Such jobs would include an order clerk, inspector, and assembler, which were all available in the regional and national economies.

The claimant contends that her reliance on the cane would preclude any light work.  The claimant maintains that because light work involves lifting twenty pounds with lifting or carrying objects up to ten pounds, a person requiring a cane to ambulate would be unable to lift or carry objects while holding on to a cane.  Thus, the claimant contends that the ALJ's failure to limit the hypothetical to consider the claimant's alleged reliance on a cane, requires reversal.

The ALJ considered many limitations in the hypothetical, including the claimant's ability

to do many daily functions, her inability to stand or walk for long periods of time, and her need to sit or stand a few minutes every hour.   While the ALJ did not consider her reliance on a cane and the alleged limitations caused by the reliance, the ALJ is not required to pose a hypothetical that assumes restrictions that the ALJ has rejected.  *See Crawford*, 363 F.3d at 1161.  Because the ALJ rejected the claimant's alleged reliance on a cane based on the lack of medical documentation showing the need for the device, the ALJ was not required to present a hypothetical and the subsequent findings regarding the claimant's use of a cane and the resulting limitations on her work.   *See id.*

The claimant also contends that the ALJ erred by failing to include the limitation of the claimant's occasional gross handling with her right hand in her RFC determination.  In expanding on the hypothetical used above, the vocational expert testified that only a very limited number of jobs exist at the unskilled level for an individual limited to sedentary and occasional gross handling with the upper right extremity who was right-hand dominant.  However, similar to the use of the cane, the ALJ does not have to accept a vocational expert's response to a hypothetical which assumes restrictions the ALJ has rejected.  *Id.*  Thus, as the ALJ found no medical evidence to support the claimant's subjective complaint of the severity of her hand pain and the alleged resulting inability to use that hand, the ALJ was not required to accept the vocational expert's determination that a very limited number of jobs are available for an individual with limited gross handling in her dominant right hand.  *See id.*

Thus, properly applying the appropriate legal standards, the ALJ correctly determined the claimant's RFC to perform light work with certain limitations, and the court finds that substantial evidence supports his RFC determination.

**4. The ALJ fully developed the record.**

The claimant contends that the ALJ erred by failing to fully develop the record as the ALJ did not contact the claimant's treating physician to ascertain whether the claimant's use of a cane is, in fact, medically required.   The court finds that the ALJ fully developed the record and was not required to contact the physician in this case because the evidence provided was adequate to determine the claimant was not disabled.

An ALJ has "a basic obligation to develop a full and fair record." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  While an ALJ has an obligation to develop the record, an ALJ is required to contact a treating physician in the *limited circumstance* where the evidence provided is *inadequate* to determine whether the claimant is disabled. *See* 20 C.F.R. § § 404.1512(e), 416.912(e) (emphasis added).  Ultimately, however, "the claimant bears the burden of proving he is disabled, and consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. § 416.912(a)).

In the present case, the ALJ had no duty to contact the claimant's treating physician to inquire about the claimant's cane use.  Because the ALJ had sufficient medical evidence in the record to conclude that the claimant was not disabled, contacting the treating physician was not necessary.  *See* 20 C.F.R. §§ 404.1512(e), 416.912(e).  First, none of the claimant's physicians ever prescribed a cane to the claimant.  During the administrative hearing, the claimant testified that she used a cane, but that her physician did not prescribe a cane.  Additionally, throughout the 700 pages in the record, no treating physician of the claimant ever required that the claimant use a cane or even suggested that using a cane was medically necessary.  Despite the claimant's alleged reliance on a cane, the claimant's testimony and medical records indicate that she has the

25

ability to complete a range of daily activities including cooking, cleaning, and driving.  Also, the objective medical evidence in the record, specifically x-rays and MRI results, indicate that the claimant only had mild degeneration in parts of her spine, with other areas of her spine being completely normal.

The record contained adequate evidence for the ALJ to determine that the claimant was not disabled, despite the claimant's alleged reliance on a cane.  Thus, the ALJ did not fail to fully develop the record by failing to contact the claimant's treating physician to determine if a cane was medically required.

## CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commission is supported by substantial evidence and is to be AFFIRMED.  The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 18th day of September,  2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE